## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

|  |  |
|---|---|
| **SHELIA SANTIZO**, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>**A&A SERVICES, LLC, D/B/A SAV-RX PRESCRIPTION SERVICES**,<br><br>        Defendant. | CASE NO.<br><br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Shelia Santizo ("Plaintiff"), individually and on behalf of herself and all others similarly situated, alleges the following against A&A Services, LLC, d/b/a Sav-Rx Prescription Services ("A&A," "A&A Services," or "Sav-Rx") ("Defendant"). The following allegations are based upon Plaintiff's personal knowledge with respect to herself and her own acts, and on information and belief as to all other matters.

## I.     <u>INTRODUCTION</u>

1.    Plaintiff and Class Members bring this class action against A&A Services, LLC d/b/a Sav-Rx Prescription Services (collectively, "Sav-Rx," the "Company," or "Defendant") for failure to properly secure and safeguard Plaintiff's and similarly situated individuals' personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information")—as defined by the Health Insurance Portability and Accountability Act ("HIPAA").

2.    A&A Services, a Fremont, Nebraska based Pharmacy Benefit Manager ("PBM") that does business as Sav-Rx Prescription Services, exposed the sensitive personal and health information of over 2.8 million patients, including but not limited to names, demographic information (such as physical addresses, phone numbers, and email addresses), dates of birth, social security numbers, and sensitive medical information such as eligibility data and insurance identification numbers in addition to Private Information maintained by Sav-Rx in connection with

the PBM services that Sav-Rx provides to health plans and their beneficiaries, including Plaintiff and members of the Class (defined herein).

3.    On or around October 8, 2023, Sav-Rx detected unauthorized activity on its computer network. An investigation was launched to determine the extent of the breach.

4.    According to Sav-Rx, the forensic investigation confirmed that an unauthorized third party gained access to "certain non-clinical systems" as early as October 3, 2023, and threat actors obtained files that contained health information and other sensitive patient data. During that time, hackers copied the private financial and medical health records of Sav-Rx's patients.[1]

5.    Sav-Rx claims to have received the results of its investigation on April 30, 2024. The review of affected files revealed that they contained PHI related to the PBM services that Sav-Rx provides to health plans. The affected individuals were either members of those health plans or current or former employees.[2]

6.    The investigation revealed that the threat actor behind the attack not only accessed the Company's systems, but they also exfiltrated files containing PHI.[3]

7.    While Sav-Rx has not admitted that there had been any ransom demand by the threat actor who accessed Class Members' Private Information, a leading online publication covering data security has concluded that "a ransom was paid out to ensure that the stolen information is not shared with other cybercriminals."[4]

8.    On May 24, 2024, Sav-Rx began informing regulators that Private Information including personal and health information may have been stolen in the breach.

9.    Although the breach occurred over eight months ago and Sav-Rx's third-party cybersecurity investigation concluded on April 30, 2024, Sav-Rx only began notifying impacted patients by mail on or around May 18, 2024 that their Private Information was compromised, including their social security numbers, date of birth, name, address, and telephone number.

---

[1] Steve Adler, *Sav-Rx Data Breach Affects 2.8 Million Individuals*, HIPAA J. (May 27, 2024), https://www.hipaajournal.com/sav-rx-data-breach/.

[2] *Id.*

[3] *Id.*

[4] Ionut Arghire, *2.8 Million Impacted by Data Breach at Prescription Services Firm Sav-Rx*, SECURITYWEEK (May 28, 2024), https://www.securityweek.com/2-8-million-impacted-by-data-breach-at-prescription-services-firm-sav-rx/.

10.     As a PBM providing pharmacy benefit services to numerous health insurance plans throughout the country, Sav-Rx cumulatively possesses and stores the Private Information of many hundreds of thousands, if not nearly three million, people in its databases.

11.     This class action is brought on behalf of all citizens of all states in the United States who are the victims of a targeted cyberattack on Sav-Rx that occurred on or before October 8, 2023 ("the Data Breach").

12.     On or before October 8, 2023, Sav-Rx allowed a cyber attacker to access and obtain the Private Information of Plaintiff and Class Members.

13.     Over six months later, on or around April 30, 2024, Sav-Rx confirmed that individuals' Private Information was exposed in the Data Breach.

14.     On May 18, 2024, Sav-Rx sent a letter of notice of the Data Breach ("Notice") to Plaintiff via U.S. mail.

15.     That Notice failed to provide basic details concerning the Data Breach, including, but not limited to, how unauthorized parties accessed the Class Members' records, whether the information was encrypted or otherwise protected, whether a ransom was paid to secure the exfiltrated data, and/or whether the breach was a system-wide breach.

16.     The Notice also failed to provide details on how many people were affected by the Data Breach.

17.     Sav-Rx knowingly stored individuals' PII and PHI in confidence, and has a resulting duty to secure, maintain, protect, and safeguard that PII and PHI against unauthorized access and disclosure through reasonable and adequate security measures.

18.     PHI is considered "the most confidential and valuable type of [PII] . . . irrevocable once breached."[5]

---

[5] Junyuan Ke, et al., *My Data or My Health? Heterogenous Patient Responses to Healthcare Data Breach*, SSRN (Feb. 10, 2022), http://dx.doi.org/10.2139/ssrn.4029103. Under HIPAA, 42 U.S.C. §§1320d, *et seq.*, PHI is considered to be individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered PHI under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. Summary of the HIPAA Privacy Rule, U.S. Dep't of Health & Human Servs, https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited June 3, 2024).

19.     As a result of the Data Breach, Plaintiff and Class Members suffered ascertainable losses, including, but not limited to, a loss of potential value of their private and confidential information, the loss of the benefit of their contractual bargain with Sav-Rx, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

20.     Plaintiff and Class Members entrusted their Private Information to Sav-Rx, its officials, and agents. That Private Information was subsequently compromised, unlawfully accessed, and stolen due to the Data Breach.

21.     Plaintiff brings this class action lawsuit on behalf of herself and all others similarly situated to address Sav-Rx's inadequate safeguarding of Plaintiff's and Class Members' Private Information, for failing to provide adequate notice to Plaintiff and other Class Members of the unauthorized access to their Private Information by a cyber attacker, and for failing to provide adequate notice of precisely what information was accessed and stolen.

22.     Sav-Rx breached its duty to Plaintiff and Class Members by maintaining Plaintiff's and the Class Members' Private Information in a negligent and reckless manner.

23.     Upon information and belief, the means of the Data Breach and potential risk for improper disclosure of Plaintiff's and Class Members' Private Information were known and foreseeable to Sav-Rx.

24.     Thus, Sav-Rx was on notice that failing to take steps necessary to secure the Private Information from those risks left the Private Information in a dangerous and vulnerable condition.

25.     Sav-Rx and its employees failed to properly monitor the computer networks, databases, and systems housing the Private Information.

26.     Had Sav-Rx properly monitored its property, it would have discovered the intrusion sooner or been able to wholly prevent it.

27.     Exacerbating an already devastating privacy intrusion, Plaintiff's and Class Members' identities are now at a heightened risk of exposure because of Sav-Rx's negligent conduct since the Private Information that Sav-Rx collected and stored is now in the hands of data thieves.

28.     Armed with the Private Information accessed in the Data Breach, data thieves can now use the PII and PHI obtained from Sav-Rx to commit a variety of crimes, including credit/debit card fraud, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class

Members' health information to target other phishing and hacking intrusions based upon their individual health needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

29.     As a direct result of the Data Breach, Plaintiff and Class Members have suffered fraud and will continue to be exposed to a heightened and imminent risk of fraud and identity theft, potentially for the rest of their lives. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

30.     Plaintiff and Class Members may also incur out-of-pocket costs for purchasing credit monitoring services, credit freezes, credit reports, and other protective measures to deter and detect identity theft.

31.     As a direct and proximate result of the Data Breach and subsequent exposure of their Private Information, Plaintiff and Class Members have suffered, and will continue to suffer damages and economic losses in the form of lost time needed to take appropriate measures to avoid unauthorized and fraudulent charges, putting alerts on their credit files, and dealing with spam phone calls, letters, and emails received as a result of the Data Breach.

32.     Plaintiff and Class Members have suffered, and will continue to suffer, an invasion of their property interest in their own PII and PHI such that they are entitled to damages from Sav-Rx for unauthorized access to, theft of, and misuse of their Private Information.

33.     These harms are ongoing, and Plaintiff and Class Members will suffer from future damages associated with the unauthorized use and misuse of their Private Information as thieves will continue to use the information to obtain money and credit in their names for several years.

34.     Plaintiff seeks to remedy these harms on behalf of all similarly situated individuals whose Private Information was accessed via and/or compromised by Sav-Rx during the Data Breach.

35.     Accordingly, Plaintiff brings this action on behalf of herself and all others similarly situated against Defendant, seeking redress for Defendant's unlawful conduct asserting claims for (I) negligence; (II) negligence per se; (III) breach of implied contract; (IV) unjust enrichment; and (V) declaratory judgment seeking damages and injunctive relief.

## II.    PARTIES

### A.  Plaintiff

36.    Plaintiff Shelia Santizo ("Ms. Santizo") is a resident of Owensboro, Kentucky and a citizen of Kentucky. Ms. Santizo learned of the Sav-Rx Data Breach through a letter sent by A&A Services to her via U.S. mail on or about May 21, 2024.

### B.  Defendant

37.    Defendant A&A Services LLC, d/b/a Sav-Rx Prescription Services ("Sav-Rx") is a limited liability corporation organized under the laws of Nebraska. Sav-Rx has a principal place of business in Nebraska at 224 North Park Avenue, Fremont, Nebraska 68025.

## III.    JURISDICTION AND VENUE

38.    This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, consists of putative class membership of greater than 100 members, and is a class action in which some members of the Class are citizens of states different than that of Defendant.

39.    This Court has personal jurisdiction over Defendant because Defendant is headquartered in Nebraska and has thus availed itself of the rights and benefits of the state of Nebraska by conducting business in Nebraska and therefore have sufficient minimum contacts in Nebraska.

40.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendant maintains a place of business within this District, a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in, was directed to, and/or emanated from this District, and Defendant purposefully conducts substantial business in this District.

## IV.    STATEMENT OF FACTS

### A.    *Defendant's Business*

41.    Headquartered in Fremont, Nebraska, where the company was founded over fifty years ago, Sav-Rx is a PBM that provides prescription drug benefit services to various organizations such as unions, employers, and health plans.[6] A PBM is a middleman in the business

---

[6] Sav-Rx, *Our Story*, https://savrx.com/story/ (last visited June 6, 2024).

of prescription drugs in the United States, operating between prescription drug manufacturers, patients, insurance companies, and pharmacies through work that includes the management and facilitation of prescription medication delivery and negotiations with drug manufacturers and pharmacies regarding prices. According to Sav-Rx, it currently "serves more than 1000 clients representing the interests and the values of millions of American workers and their families across virtually every trade, skill, craft, and industry."[7]

42.    During the period in which it was collecting Private Information from Class Members to provide PBM services, Sav-Rx's Notice of Privacy Practices stated, "We are required by law to maintain the privacy and security of your protected health information."[8]

43.    In addition, Sav-Rx stated on the Frequently Asked Questions ("FAQ") portion of its website, "We provide medication benefits management services to health plan customers. Individuals affected by the incident are or once were participants of those health plans or current or former employees."[9]

B.    **Class Members' Private Information Was Entrusted to Defendant for the Delivery of Services in Addition to the Purpose of Continued Secure Archival Storage**

44.    Sav-Rx provided pharmacy, health plan, and prescription drug benefit management to thousands of patients nationwide per year. Through the administration of those services Sav-Rx collected, stored, and continue to store vast quantities of patients' Private Information.

45.    In so doing, Defendant was required to ensure that patients' Private Information was not disclosed or disseminated to unauthorized third parties without Plaintiff's and Class Members' express written consent.

46.    According to its Notice of Privacy Practices, Sav-Rx guaranteed that its participants' patient records and associated data was held in compliance with lawful data retention requirements and practices.

47.    Through the possession and utilization of Plaintiff's and Class Members' Private Information, Sav-Rx assumed duties owed to Plaintiff and Class Members regarding their Private Information.

---

[7] *Id.*

[8] Sav-Rx, *Notice of Privacy Practices*, https://savrx.com/privacy-policy-2/ (last visited June 6, 2024).

[9] Sav-RX, *FAQ*, https://faq.savrx.com/ (last visited June 6, 2024).

48.     Therefore, Sav-Rx knew or should have known that it was responsible for safeguarding Plaintiff's and Class Members' Private Information from unauthorized access and criminal misuse.

49.     Plaintiff and Class Members relied on Sav-Rx to keep their Private Information secure and safeguarded for authorized purposes.

50.     Sav-Rx owed a duty to Plaintiff to secure their Private Information as such, and ultimately breached that duty.

### C.    *The Data Breach*

51.     On or around October 8, 2023, a cyber attacker gained access to Sav-Rx's patient records and retained access to that database for un unidentified period of time. During that time, numerous files were copied. Sav-Rx described the exfiltration by stating, "We learned that an unauthorized third party was able to access certain non-clinical systems and obtained files that contained personal information."[10]

52.     Rather than notify affected individuals immediately, however, Sav-Rx maintained that "our initial priority was restoring systems to minimize any interruption to patient care,"[11] and while IT and medication delivery operations resumed within a day, individuals impacted by the threat actor's exfiltration were not informed of the Data Breach until eight months later.

53.     Sav-Rx explained that it took the company eight months to send out breach notices to impacted customers because Sav-Rx's initial priority was to minimize interruption to patient care before launching an investigation on the impact of the incident.[12]

54.     On a portion of Sav-Rx's FAQ webpage entitled, "Why wasn't I contacted sooner?" Sav-Rx explained the delay by stating:

> After our systems were secured, we worked with third-party cybersecurity experts that launched an investigation. That investigation was aimed at determining the affected individuals, as well as the specific elements of each individual's personal information affected by the incident. We prioritized this technological investigation

---

[10] *Id.*

[11] *Id.*

[12] Bill Toulas, *Sav-Rx discloses data breach impacting 2.8 million Americans*, BLEEPINGCOMPUTER (May 27, 2024), https://www.bleepingcomputer.com/news/security/sav-rx-discloses-data-breach-impacting-28-million-americans/.

to be able to provide affected individuals with as much accurate information as possible. We received the results of that investigation on April 30, 2024.[13]

55.    Sav-Rx also noted that it did not rush to conclude investigations, striving for as accurate results as possible. It said its health plan customers (impacted organizations) were notified earlier, between April 30, 2024 and May 2, 2024, and only after Sav-Rx reached an agreement with its business customers did it begin to notify impacted individuals.[14]

56.    On May 24, 2024, Sav-Rx filed a Data Breach Notification with the Office of the Maine Attorney General reporting that 2,812,336 individuals were affected by the Data Breach.[15]

57.    On Sav-Rx's FAQ webpage, the Company linked to a sample letter it provided to the Maine Attorney General's Office where Sav-Rx stated that Plaintiff's and Class Members' PII and PHI had been exposed, and therefore compromised, in the attack, including:

    i.    Full name;

    ii.    Date of birth;

    iii.    Social Security number;

    iv.    Email address;

    v.    Physical address;

    vi.    Phone number; and

    vii.    Information provided to Sav-Rx in connection with services offered by Sav-Rx, including eligibility data and insurance identification number.[16]

58.    Sav-Rx's Notice to affected individuals was untimely and woefully deficient, failing to provide basic details concerning the Data Breach, including, but not limited to, how unauthorized parties accessed Sav-Rx's files, whether the information was encrypted or otherwise protected, whether the breach was a system-wide breach, and how many people were affected by the Data Breach.

---

[13] Sav-Rx, *FAQ, supra* note 9.

[14] *Id.*

[15] Maine Att'y Gen. Off., *Consumer Information, Data Breach Notifications*, https://apps.web.maine.gov/online/aeviewer/ME/40/8912d568-e577-49a3-93ba-f9341533d332.shtml (last visited June 6, 2024).

[16] Sav-Rx, *FAQ, What did the notification letter say?,* https://faq.savrx.com/Sav-RX1.0.0_FAQ.pdf (last visited June 6, 2024).

59.     Although the Data Breach occurred on October 8, 2023, over eight months ago, Sav-Rx only recently began notifying impacted patients by mail on or around May 18, 2024—seven months after the initial intrusion and public revelation of the cyber hackers' criminal intentions.

60.     Given the intentional and criminal nature of the cybersecurity attack, Plaintiff's and Class Members' Private Information is (and has now been for months) on sale to criminals on the dark web; meaning unauthorized parties have accessed and viewed Plaintiff's and Class Members' unencrypted, unredacted Private Information, including names, dates of birth, medical records, diagnosis information, Social Security numbers, insurance identification and eligibility data, and more.

### D.     *Plaintiff's Experiences Following the Data Breach*

#### Shelia Santizo

61.     Sav-Rx provides or provided PBM services to Plaintiff Ms. Santizo.

62.     Plaintiff was required to provide Private Information as a condition of receiving Sav-Rx's PBM services.

63.     Plaintiff first received Notice of the Data Breach from A&A Services in the form of a letter dated May 18, 2024, that was received by mail on or around May 21, 2024.

64.     Plaintiff subsequently received further Notices of the Data Breach from A&A Services addressed to her minor children on or around June 1, 2024, June 3, 2024, and June 5, 2024.

65.     Thereafter, Plaintiff spent time taking action to investigate and mitigate the impact of the Data Breach, including signing up for the two-year offer of credit monitoring provided by Sav-Rx. Plaintiff took the additional step of initiating a credit freeze for herself.

66.     When Ms. Santizo took steps to initiate a credit freeze for herself, she learned of information indicating that unauthorized accounts may have been opened, or were attempted to have been opened, using her Private Information.

67.     Plaintiff intends to spend additional time and effort taking steps to protect her Private Information and that of her minor children in the future. Because of the Data Breach, Plaintiff spent valuable time attempting to mitigate the harm she otherwise would have spent on other obligations.

68.     Moreover, Plaintiff spent this time at Defendant Sav-Rx's direction. In the Notice posted by Sav-Rx, Defendant encouraged Plaintiff and Class Members to spend time mitigating

their losses by "in addition to enrolling in credit monitoring . . . remain[ing] vigilant for incidents of fraud and identity theft."[17]

69.     Since the time of the Data Breach, Plaintiff has noticed receiving an increased number of unsolicited telephone calls, text messages, and email to her personal phone number and email address.

70.     As a result of the Data Breach, Plaintiff suffered lost time, annoyance, interference, and inconvenience. This is time Plaintiff otherwise would have spent performing other activities, such as her job, and/or leisurely activities for the enjoyment of life.

71.     As a result of the Data Breach, Plaintiff suffered emotional distress because of the release of her Private Information and the Private Information of her minor children which she expected Defendant to protect from disclosure, including anxiety, concern, and unease about unauthorized parties viewing, and potentially using their Private Information.

72.     As a result of the Data Breach, Plaintiff will continue to be at heightened risk for financial fraud, medical fraud, and identity theft, and the attendant damages, for years to come.

73.     Plaintiff's minor children will also continue to be at heightened risk for financial fraud, medical fraud, and identity theft, and the attendant damages, for years to come.

### E.     Defendant Knew or Should Have Known Both the Value of Private Information and the Risk of Cyberattacks to Those Who Possess Such Private Information

74.     At all relevant times, Defendant Sav-Rx was well aware that the Private Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

75.     Private Information is a valuable commodity to cyber attackers. As the U.S. Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[18]

76.     Approximately twenty-one percent of victims do not realize their identities have been compromised until more than two years after it has happened. This gives data thieves ample time to seek multiple treatments or pursue multiple financial schemes under the victim's name.

---

[17] Id.

[18] FTC, What to Know About Identity Theft, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed June 6, 2024).

77.     As entities serving consumers in the healthcare sector, Defendant knew, or reasonably should have known, the importance of safeguarding Plaintiff's and Class Members' Private Information entrusted to it, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### F.     The Healthcare Sector Is Particularly Susceptible to Cyberattacks

78.     Sav-Rx was or should have been on notice that the Federal Bureau of Investigation ("FBI") has been concerned about data security in the healthcare sector. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[19]

79.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[20]

80.     The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[21]

---

[19] Jim Finkle, *FBI warns healthcare firms that they are targeted by hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[20] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

[21] CyberScout, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, CISION PR NEWSWIRE (Jan. 19, 2017), https://www.prnewswire.com/news-releases/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout-300393208.html.

81.    In 2022, 1,802 data compromises were reported that impacted over 422 million victims—marking a 42% increase in the number of victims impacted since 2021.[22] That upward trend continues.

82.    The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[23] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential.

83.    A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[24] Almost 50% of the victims lost their healthcare coverage as a result of the incident, while nearly thirty percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[25]

84.    Healthcare related data breaches also come at a cost to the breached entities. According to IBM's 2023 Cost of a Data Breach Report, the healthcare sector reported the highest data breach costs for the thirteenth year in a row in 2023—increasing 8.2% from $10.10 million in 2022 to $10.93 million in 2023.[26] This cost should only further incentivize healthcare service providers to both invest in and implement reasonable and adequate security measures in order to avoid financial repercussions in the event of a breach.

85.    Healthcare related data breaches have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders

---

[22] ITRC, *2022 Annual Data Breach Report*, IDENTITY THEFT RES. CTR. (Jan. 2023), https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf.

[23] ITRC, *2018 End-of-Year Data Breach Report*, IDENTITY THEFT RES. CTR. (2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINALWEB-V2-2.pdf.

[24] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/. .

[25] *Id.*

[26] *See* IBM, *Cost of a Data Breach Report*, IBM.com, https://www.ibm.com/reports/data-breach (last visited June 6, 2024).

reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[27]

> Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information (PII) for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers.[28]

86.    Given Sav-Rx's work centered on maintaining sensitive Private Information, Sav-Rx knew or reasonably should have known the importance of implementing reasonable and adequate practices and procedures in order to safeguard the Private Information entrusted to it by individuals receiving healthcare services.

87.    As a healthcare service provider handling, storing, and safeguarding Private Information, Sav-Rx knew, or reasonably should have known, the importance of safeguarding the Private Information entrusted to it and of the foreseeable consequences if their data security systems were breached. This duty extended to Sav-Rx's obligations to safeguard its affiliates and subsidiaries' Private Information. Sav-Rx failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### G.    The Value of Private Information and the Effects of Unauthorized Disclosure

88.    At all relevant times, Sav-Rx was well aware that the Private Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

89.    Private Information is a valuable commodity to cyber attackers. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[29]  Indeed, a robust "cyber black market" exists in

---

[27] HIMMS, *2019 HIMSS Cybersecurity Survey* (2019), https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf.

[28] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, CHIEF HEALTHCARE EXEC. (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

[29] FED. TRADE COMM'N, *supra* note 18.

which criminals openly post stolen Private Information on multiple underground websites, commonly referred to as the dark web.

90.    While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363.[30]

91.    PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

92.    Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment.

93.    "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[31]

94.    Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[32]

95.    The ramifications of Sav-Rx's failures to keep Plaintiff's and Class Members' Private Information secure are long lasting and severe. Once Private Information is stolen,

---

[30]    CIS, *Data Breaches: In the Healthcare Sector,* Ctr. for Internet Sec., https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited June 6, 2024).

[31]    Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.

[32]    FBI, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI Cyber Div. (Apr. 8, 2014), https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf.

fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to twelve months or even longer.

96.    Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

97.    Most victims do not realize their identity has been compromised until more than two years after it has happened.[33] This gives thieves ample time to seek multiple treatments under the victim's name. And many consumers find out they were a victim of medical identity theft only when they receive collection letters from creditors for expenses that were incurred in their names.[34]

98.    As a company contracting with healthcare entities, Sav-Rx knew, or reasonably should have known, the importance of safeguarding Plaintiff's and Class Members' Private Information entrusted to it, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach. Sav-Rx failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### H.    Defendant Failed to Comply with FTC Guidelines

99.    Sav-Rx was also prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive Private Information is an "unfair practice" in violation of the FTCA.[35]

100.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[36]

---

[33] *See* IdentityForce, *Medical ID Theft Checklist* (Jan. 11, 2023),
https://www.identityforce.com/blog/medical-id-theft-checklist-2.

[34] *Id.*

[35] *See, e.g.*, *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020) (citing *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)).

[36] FTC, *Start With Security: A Guide for Business* at 2, (June 2015),
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

101.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[37] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of Private Information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct any security problems.

102.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

103.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45. Orders resulting from these actions further clarify the measures businesses must take to meet its data security obligations.

104.    Sav-Rx failed to properly implement basic data security practices. Sav-Rx's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45.

105.    Sav-Rx was fully aware of its obligations to protect the Private Information of Plaintiff and Class Members because of its position as a service provider whose business centers on the collection, storage, and safeguarding of Private Information. Sav-Rx was also aware of the significant repercussions that would result from its failure to make good on those obligations.

## I.    *Cyber Criminals Have and Will Continue to Use Plaintiff's and Class Members' Private Information for Nefarious Purposes*

106.    Plaintiff's and Class Members' highly sensitive Private Information is of great value to cybercriminals, and the data stolen in the Data Breach can be used in a variety of ways

---

[37] FTC, *Protecting Personal Information: A Guide for Business*, (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

for criminals to exploit Plaintiff and the Class Members and to profit off their misfortune and stolen information. The cybercriminals' motives for the Data Breach were purely nefarious and malicious in nature: their one goal was to access systems, including Sav-Rx's systems, in order to obtain valuable Private Information to sell on the dark web.

107.    Every year, identity theft causes tens of billions of dollars of losses to victims in the United States.[38]  For example, with the PII stolen in the Data Breach, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[39] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

108.    PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.

109.    These risks are both certainly impending and substantial. As the FTC has reported, if cyber attackers get access to PII, they will use it.[40]

110.    Cyber attackers may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[41]

---

[38] Insurance Information Institute, *Facts + Statistics: Identity Theft and Cybercrime*, INS. INFO. INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited June 6, 2024).

[39] Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, USA TODAY (Nov. 15, 2017), https://www.usatoday.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/.

[40] GAO, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* at 2, GAO-07-737, GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

[41] *Id.* at 29.

111.    If cyber criminals manage to access PII, health insurance information, and other personally sensitive data, as is the case with this Data Breach, there is no limit to the amount of fraud to which Sav-Rx may have exposed Plaintiff and Class Members.

### J.    Plaintiff and Class Members Suffered Damages

112.    The ramifications of Sav-Rx's failures to keep Plaintiff's and Class Members' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[42]

113.    In addition to their obligations under state laws and regulations, Sav-Rx owed a common law duty to Plaintiff and Class Members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

114.    This duty extends to Sav-Rx's obligations to safeguard Private Information received from or shared with subcontractors, health plans, and/or service vendors who exchange Private Information with Sav-Rx, and to conduct ongoing, robust due diligence into such subcontractors and service vendors prior to contracting and throughout any relationship.

115.    Sav-Rx further owed and breached its duties to Plaintiff and Class Members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems. Instead of implementing such processes and specifications, Sav-Rx allowed the Data Breach to go undetected for three days before it was alerted by its third-party vendor of the cyberattack.

116.    As a direct result of Sav-Rx's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, cyber attackers were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiff's and Class Members' Private Information as detailed above, and Plaintiff is now at a heightened risk of identity theft and fraud.

---

[42] LexisNexis, *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014), https://web.archive.org/web/20141113155351/https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

117.    The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing, or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

118.    Other risks of identity theft include loans opened in the name of the victim, medical services billed in their name, utility bills opened in their name, tax return fraud, and credit card fraud.

119.    Plaintiff and Class Members did not receive the full benefit of the bargain for received healthcare and other services. As a result, Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value of the healthcare services with data security protection they paid for and the services they received without the data security protection.

120.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information has lost potential value.

121.    The Private Information belonging to Plaintiff and Class Members is private in nature and was left inadequately protected by Sav-Rx who did not obtain Plaintiff's or Class Members' consent to disclose such Private Information to any other person as required by applicable law and industry standards.

122.    The Data Breach was a direct and proximate result of Sav-Rx's failure to: (a) properly safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

123.    Sav-Rx had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect patient data.

124.    Had Sav-Rx remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into their systems and, ultimately, the theft of Plaintiff's and Class Members' Private Information.

125.    As a direct and proximate result of Sav-Rx's wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

126.    The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "[r]esolving the problems caused by identity theft [could] take more than a year for some victims."[43]

127.    Sav-Rx's failures to adequately protect Plaintiff's and Class Members' Private Information has resulted in Plaintiff and Class Members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money. Rather than assist those affected by the Data Breach, Sav-Rx is putting the burden on Plaintiff and Class Members to discover possible fraudulent activity and identity theft.

128.    As a result of Sav-Rx's failures to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, and are at increased risk of suffering:

    a.   The compromise, publication, theft and/or unauthorized use of their Private Information;

    b.   Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

    c.   Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

    d.   The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fail to undertake appropriate measures to protect the Private Information in their possession;

---

[43] Erika Harrell, & Lynn Langton, *Victims of Identity Theft, 2012*, U.S. DEP'T OF JUST., OFF. OF JUST. PROGRAMS BUREAU OF JUST. STATS. (Dec. 2013), https://bjs.ojp.gov/content/pub/pdf/vit12.pdf.

> e.  Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and
>
> f.  Anxiety and distress resulting from fear of misuse of their medical information.

129.  In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

### K.  Sav-Rx's Delay in Identifying & Reporting the Data Breach Caused Additional Harm

130.  It is axiomatic that:

> [t]he quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act.[44]

131.  Indeed, once a data breach has occurred,

> [o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers.
>
> "If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves."[45]

132.  Although their Private Information was improperly exposed on or before October 3, 2023, Sav-Rx did not notify Plaintiff and Class Members until over seven months following the

---

[44] Javelin Strategy & Research, *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire (Feb. 1, 2017), https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million.

[45] Allen St. John, *The Data Breach Next Door*, CONSUMER REPORTS, (Jan. 31, 2019), https://www.consumerreports.org/data-theft/the-data-breach-next-door/.

Data Breach. Sav-Rx's delay deprived Plaintiff and Class Members of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

133.    As a result of Sav-Rx's delay in detecting and notifying individuals of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

## V.    CLASS ALLEGATIONS

134.    Plaintiff brings this class action on behalf of herself and all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

135.    The Class that Plaintiff seeks to represent is defined as follows:

**All individuals in the United States whose Private Information was compromised by Defendant in the Data Breach.**

136.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as its immediate family members.

137.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

138.    <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Class is so numerous that joinder of all members is impracticable. Defendant has informed the Maine Attorney General that there are approximately 2,812,336 individuals whose Private Information may have been improperly accessed and compromised in the Data Breach.

139.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

  i. Whether and when Defendant actually learned of the Data Breach and whether Defendant's response was adequate;

  ii. Whether Defendant owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining Class Members' Private Information;

  iii. Whether Defendant breached that duty;

iv.   Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiff's and Class Members' Private Information;

v.    Whether Defendant acted negligently in connection with the monitoring and/or protecting of Plaintiff's and Class Members' Private Information;

vi.   Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and Class Members' Private Information secure and prevent loss or misuse of that Private Information;

vii.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

viii. Whether Defendant caused Plaintiff's and Class Members' damages;

ix.   Whether Defendant violated the law by failing to promptly notify Class Members that their Private Information had been compromised;

x.    Whether Plaintiff and the other Class Members are entitled to actual damages, extended credit monitoring, and other monetary relief;

xi.   Whether Defendant violated common law and statutory claims alleged herein.

140.  <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members, because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

141.  <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect the Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

142.  <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel

experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.

143.   <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

144.   The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of the Class with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

145.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

146.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

147.   Unless a Class-wide injunction is issued, Plaintiff and Class Members remain at risk that Defendant will continue to fail to properly secure the Private Information of Plaintiff and Class Members resulting in another data breach, continue to refuse to provide proper notification

to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Class Action Complaint.

148.   Defendant acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

149.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

   a.   Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, using, and safeguarding their Private Information;

   b.   Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

   c.   Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

   d.   Whether Defendant failed to implement and maintain reasonable and adequate security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

   e.   Whether Class Members are entitled to actual damages, additional credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## VI.   CLAIMS FOR RELIEF
### COUNT I
**Negligence**
**(On Behalf of Plaintiff and the Class)**

150.   Plaintiff repeats and realleges all allegations set forth above as if they were fully set forth herein.

151.   Plaintiff and Class Members were required to submit their Private Information to Defendant in order to receive services from Defendant.

152.    Defendant knew, or should have known, of the risks inherent in collecting and storing the Private Information of Plaintiff and Class Members.

153.    As described above, Defendant owed duties of care to Plaintiff and Class Members whose Private Information had been entrusted with Defendant.

154.    Defendant breached their duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

155.    Defendant acted with wanton disregard for the security of Plaintiff's and Class Members' Private Information. Defendant knew or reasonably should have known that it had inadequate data security practices to safeguard such information, and Defendant knew or reasonably should have known that data thieves were attempting to access databases containing Private Information, such as those of Defendant.

156.    A "special relationship" exists between Defendant and Plaintiff and Class Members. Defendant entered into a "special relationship" with Plaintiff and Class Members because Defendant collected the Private Information of Plaintiff and the Class Members— information that Plaintiff and the Class Members were required to provide in order to receive services from Defendant.

157.    But for Defendant's wrongful and negligent breaches of the duties owed to Plaintiff and the Class Members, Plaintiff and the Class Members would not have been injured.

158.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breaches of its duties. Defendant knew or reasonably should have known it was failing to meet its duties, and that Defendant's breaches of such duties would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

159.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to injunctive relief. Plaintiffs and Class Members have suffered economic damages as well, in an amount to be proven at trial.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

160.    Plaintiff repeats and realleges all allegations set forth above as if they were fully set forth herein.

161.    Pursuant to the FTCA (15 U.S.C. § 45), Defendant had a duty to provide fair and adequate data security practices to safeguard Plaintiff's and Class Members' Private Information.

162.    Defendant breached its duties to Plaintiff and Class Members under the FTCA (15 U.S.C. § 45) by failing to provide fair, reasonable, or adequate data security practices to safeguard Plaintiff's and Class Members' Private Information.

163.    Defendant's failures to comply with applicable laws and regulations constitutes negligence *per se*.

164.    But for Defendant's wrongful and negligent breaches of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

165.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breaches of its duties. Defendant knew or reasonably should have known that it was failing to meet their duties, and that Defendant's breaches would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

166.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered and are entitled to injunctive relief. Plaintiffs and Class Members have suffered economic damages as well, in an amount to be proven at trial.

## COUNT III
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Class)

167.    Plaintiff repeats and realleges all allegations set forth above as if they were fully set forth herein.

168.    Plaintiff and Class Members entered into an implied contract with Defendant when they sought or obtained PBM services from Defendant, in exchange for which they were required to provide their Private Information. The Private Information provided by Plaintiff and Class

Members to Defendant was governed by and subject to Defendant's representations about privacy and security and its privacy duties and policies.

169.    Defendant agreed to safeguard and protect the Private Information of Plaintiff and Class Members and to timely and accurately notify Plaintiff and Class Members in the event that their Private Information was breached or otherwise compromised.

170.    Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that Defendant's data security practices and policies were reasonable and consistent with industry standards. Plaintiff and Class Members believed that Defendant would use part of the monies paid to Defendant under the implied contracts to fund adequate and reasonable data security practices.

171.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract or implied terms between Plaintiff and Class Members and Defendant. The safeguarding of the Private Information of Plaintiff and Class Members and prompt and sufficient notification of a breach involving Private Information was critical to realize the intent of the parties.

172.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

173.    Defendant breached their implied contracts with Plaintiff and Class Members to protect Plaintiff's and Class Members' Private Information when it (1) failed to have data security practices in place to protect that information; (2) disclosed that information to unauthorized third parties; and (3) failed to provide timely and accurate notice that their Private Information was compromised as a result of the Data Breach.

174.    As a direct and proximate result of Defendant's breaches of implied contract, Plaintiff and Class Members are entitled to injunctive relief. Plaintiffs and Class Members have suffered economic damages as well, in an amount to be proven at trial.

<u>**COUNT IV**</u>
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

175.    Plaintiff repeats and realleges all allegations set forth above as if they were fully set forth herein.

176.    This Count is pleaded in the alternative to the breach of implied contract claim above (Count III).

177.    Plaintiff and Class Members conferred a benefit on Defendant. Specifically, they provided Defendant with their Private Information—Private Information that has inherent value. In exchange, Plaintiff and Class Members should have been entitled to Defendant's adequate storage and safeguarding of their Private Information.

178.    Defendant appreciated or had knowledge of the benefits conferred upon them by Plaintiff and Class Members.

179.    Defendant benefitted from Plaintiff's and Class Members' retained Private Information and used their Private Information for business purposes.

180.    Defendant failed to store and safeguard Plaintiff's and Class Members' Private Information. Had Plaintiff and Class Members known that Defendant were unable to adequately store and safeguard their Private Information, they would not have agreed to provide such Private Information to Defendant.

181.    As a result of Defendant's failures, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between the services with the adequate data privacy and security practices that Plaintiff and Class Members bargained for and the services without adequate data privacy and security practices that they received.

182.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement—or adequately implement—the data privacy and security practices that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws, and industry standards.

183.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by Defendant.

184.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendant traceable to Plaintiff and Class Members.

**COUNT V**
**Declaratory Judgment**
**(On behalf of Plaintiff and the Class against Defendant)**

185.    Plaintiffs repeat and reallege all allegations set forth above as if they were fully set forth herein.

186.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of federal statutes described in this Complaint.

187.    An actual controversy has arisen in the wake of the Data Breach regarding Sav-Rx's present and prospective common law and other duties to reasonably safeguard Private Information and whether Sav-Rx is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further cyberattacks and data breaches that could compromise their Private Information.

188.    Sav-Rx still possesses Private Information pertaining to Plaintiffs and Class Members and continues to share this Private Information with third parties, including its vendors, which means that Plaintiff's and Class Members' Private Information remains at risk of further breaches because Sav-Rx's data security measures remain inadequate.

189.    Plaintiffs and Class Members continue to suffer injuries as a result of the compromise of their Private Information and remain at an imminent risk that subsequent compromises of their Private Information will occur in the future.

190.    Pursuant to the Declaratory Judgment Act, Plaintiffs and Class Members seek a declaration that: (a) Sav-Rx's existing data security measures do not comply with its obligations and duties of care; and (b) in order to comply with their obligations and duties of care, (1) Sav-Rx must have policies and procedures in place to ensure the parties with whom it shares sensitive Private Information maintain reasonable, industry-standard security measures, including, but not limited to, those provided by the FTC or other governmental or regulatory industry guidelines, and must comply with those policies and procedures; (2) Defendants must: (i) purge, delete, or destroy in a reasonably secure manner Plaintiff's and Class Members' Private Information if it is no longer necessary to perform essential business functions so that it is not subject to further theft; and (ii) implement and maintain reasonable, industry-standard security measures, including, but not limited to:

a. Engaging third-party security auditors or penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on SAV-Rx's systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Encrypting Private Information and segmenting Private Information by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of its systems;

e. Purging, deleting, and destroying in a reasonable and secure manner sensitive Private Information not necessary to perform essential business functions;

f. Conducting regular database scanning and security checks;

g. Conducting regular employee education regarding best security practices;

h. Implementing multi-factor authentication and other industry-standard procedures to combat system-wide cyberattacks; and

i. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and identify what to do in response to a breach.

## VII.    **PRAYER FOR RELIEF**

A.    That the Court certify this action as a class action and certify the Class as proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, declare that Plaintiff is the proper class representative, and appoint Plaintiff's Counsel as Class counsel;

B.    That the Court grant permanent injunctive relief to prohibit Defendant from engaging in the unlawful acts, omissions, and practices described herein;

C.    That the Court award Plaintiff and members of the Class compensatory, consequential, and general damages an amount to be determined at trial;

D.    That the Court award punitive damages, as allowable by law;

E.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of their unlawful acts, omissions, and practices;

F.      That Plaintiff be granted the declaratory relief sought herein;

G.      That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

I.      That the Court grant all such other relief as it deems just and proper.

## VIII.  <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated:  June 12, 2024

**SHELIA SANTIZO**, Plaintiff

By:     Baylor Evnen Wolfe & Tannehill, LLP
        Union Bank Place
        1248 O Street, Suite 900
        Lincoln, NE  68508
        Phone: (402) 475-1075
        Fax: (402) 475-9515
        Email: jcrouse@baylorevnen.com
        nluhm@baylorevnen.com

By:     */s/ Jarrod P. Crouse*
        Jarrod P. Crouse, # 22880
        Nicole J. Luhm, #26600

        and

**BERMAN TABACCO**
Patrick T. Egan (BBO #637477)
Steven J. Buttacavoli (BBO #651440)
One Liberty Square
Boston, MA 02109
Phone: (617) 542-8300
Email: pegan@bermantabacco.com
sbuttacavoli@bermantabacco.com

Pierce H. Stanley (CA Bar No. 352152)
425 California Street, Suite 2300
San Francisco, CA 94104
Phone: (415) 433-3200
Email: pstanley@bermantabacco.com

*Anticipated Pro Hac Vice Counsel for Plaintiff*
*Shelia Santizo and the Proposed Class*